Gladys M. Vandaveer, Plaintiff-Appellee, v. Norfolk and Western Railway Company, a Corporation, Defendant-Appellant.

Gen. No. 66–23.

Fifth District.

December 31, 1966.

Pope and Driemeyer, of East St. Louis, for appellant.

Chapman, Strawn & Kinder, of Granite City (Morris B. Chapman, of counsel), for appellee.

EBERSPACHER, J.

Defendant, Norfolk and Western Railway Company, appeals from a $40,000 judgment entered on a jury verdict, in a case brought under the Federal Employers' Liability Act (FELA, 45 USCA, 51), assigning as error the court's denial of the post-trial motion, which prayed for judgment notwithstanding the verdict, and in the alternative a new trial.

The plaintiff, Gladys Vandaveer, was a 37-year-old married woman, who, since she was 18 years old, had been employed by The New York, Chicago and St. Louis Railroad Company (Nickel Plate) in various capacities, and who on November 30, 1961, successfully exercised her seniority to bid into and take a messenger job, which she held on January 2, 1963, the date of the occurrence out of which her injuries arose. (In October 1964 the defendant, Norfolk and Western, became the successor to the Nickel Plate by merger.)

Plaintiff's work as a messenger followed a similar daily pattern. Her duties as a messenger required the use of an automobile and she used her own car, a Volkswagon, for which she was paid a mileage allowance in addition to her hourly pay. Since March 30, 1962, on the morning of each working day, she picked up mail at the Madison, Illinois post office, and after making various deliveries, and exchanges with messengers from other railroads, drove to the Union Station in St. Louis where she delivered, exchanged, and picked up mail in the baggage room, which was located near the 20th Street entrance to the station, and then proceeded through the midway of the station to the 18th Street side of the station to the offices of the Terminal Railroad Associa-

tion, where she picked up the railroad bills, and returned with them through the midway of the station to the 20th Street entrance, and thence to her parked car, and back to her employer's office in East St. Louis. Previous to March 30, 1962, her duties as a messenger took plaintiff over a different route, which included use of the 18th Street entrance of the Union Station in St. Louis, but not use of the 20th Street entrance and did not include her necessarily passing through the midway of the station.

On January 2, 1963, plaintiff made her deliveries in the customary manner and at about 11:00 a. m. drove her Volkswagon to the 20th Street side of Union Station. The parking area near the entrance, reserved for those with business at the station, was filled, and she parked at an angle on the East side of 20th Street. There were 10 to 12 other cars parked between her car and the 20th Street entrance to the station which she used. She then got out of her car, left her purse under the seat and the door of her car unlocked, proceeded through the 20th Street entranceway into the baggage room through the midway to the 18th Street side of the station, picked up a small sack containing the railroad bills and returned through the station to her car parked on 20th Street.

She opened the car door on the driver's side and put the mail and the small sack on the floor of the back seat. As she did so, one of two men spun her around and the other grabbed her arms from behind. The two men demanded her money, and allowed her to reach into her coat pocket and give them what money she had in her coat pocket; an amount between two and three dollars. One man jerked off her earrings, and one started to tear off her clothes, jerking off her coat and sweater and reaching inside her bra. At that time they were distracted by an approaching motorcycle policeman, and she was shoved down into the seat of her car, hitting her breast

190

and side on the steering wheel. Her attackers got into their car, parked aside of hers, and fled. She had noticed the two men parked in the car next to her before she entered the station but paid no particular attention to them, since she customarily observed persons in cars parked in this area.

Plaintiff stopped the motorcycle policeman, told him what had occurred, declined his offer to accompany her to the railroad's office and returned to the railroad's office in East St. Louis, before noon. There she reported the occurrence to her superior, and at his suggestion, went to her home and stayed there the following day.

When she returned to work on January 4th, at the suggestion of the train master, she went to the office of a physician, Dr. Compton, who did some medical work for the railroad, who treated her for bruises of her arms and back, headaches, and nervousness, and released her to return to work a month later. Dr. Compton found that she was suffering from extreme nervousness and told her that if she did not improve she should have some psychiatric treatment. She returned to her employment, and continued to perform her duties until May 1, when at the suggestion of her personal physician, Dr. Smith, who had been treating her for various physical complaints for more than 4 years before her encounter with the two men, and under whose direction she had both before and after January 2nd taken tranquilizers, she took a leave of absence. She was prevented from returning to work at the expiration of her leave of absence due to recurrence of a kidney ailment and back complaint, both of which, according to her doctors, had no relationship to her experience of January 2.

In February of 1964, plaintiff was hospitalized for treatment of a peptic ulcer. Plaintiff was subsequently referred to a psychiatrist in November 1964, who caused her to be hospitalized, where she received shock therapy.

191

At the time of trial she complained of nervousness and occasional nausea. It was the psychiatrist's, Dr. Mc-Mahon's, opinion, based upon a reasonable degree of medical certainty, that the condition with which plaintiff is afflicted is permanent, and that she cannot return to work. Both Dr. Compton and Dr. Smith were of the opinion, within a reasonable degree of medical certainty, that plaintiff's ulcer could be the result of the trauma involved when she was attacked by the two men, and Dr. Smith testified that, in his opinion, there was a causal connection between plaintiff's severe anxiety and the attack of January 2, 1963.

Plaintiff, in her amended complaint charged defendant with the following negligent acts and omissions, to wit:

"A. With knowledge, or the reasonable means of same, by exercising ordinary care that the area which Plaintiff was sent to conduct said business and park her said car and subject herself to was a decadent area, and one frequently habituated by persons of low morality and disposed to violence and crime, and who would be prone to assault and harm Plaintiff, negligently and carelessly failed to provide her a safe place to park her vehicle so that she would have safe ingress and egress to said station.

"B. With knowledge, or the reasonable means of same, by exercising ordinary care that the area which Plaintiff was sent to conduct said business and park her said car and subject herself to, was a decadent area, and one frequently habituated by persons of low morality and disposed to violence and crime, and who would be prone to assault and harm Plaintiff, negligently and carelessly failed to furnish Plaintiff with a guard or any other means of protection while she carried papers and properties of the said Defendant which would lure the persons of propensities to her as aforesaid.

"C. Negligently and carelessly failed to use reasonable care to provide Plaintiff with a reasonably safe place to work."

Plaintiff presented evidence to the effect that previous to this occurrence she had felt apprehensive with reference to the parking situation but had only related this to her husband, also an employee of defendant, and a few girls on the extra board. She had never reported or complained about the parking situation to either of her superiors. At the time she bid in the messenger's job, she was advised by her superior that there was no allowance for parking. There was a parking facility inside the Union Station, with an attendant on duty. Her evidence suggests that this was not available to her, because it was limited to use by employees of the Terminal Railroad Association. The parking lot, located on the West side of 20th Street, and extending a block North and South, opposite the 20th Street entrance, was connected to Union Station by a tunnel under 20th Street. It was not available to her without payment of a parking fee. Previous to January 2, 1963, plaintiff had for 5 days each week, for at least 26 weeks, parked her car on the East side of 20th Street, next to the station; how near to the 20th Street entrance depending upon where space was available. On this particular day, it was available 10 to 12 spaces South of the 20th Street entrance. Other women messengers also parked their cars in this same area. Spaces near the entrance were restricted for use by persons having business in the station, but those spaces were filled upon plaintiff's arrival.

During the time plaintiff had been parking in this area, she had never been accosted or threatened before, and she had never seen anyone else have such experience; nor does the record show that during the entire year immediately preceding this occurrence, that any person had been accosted, attacked or robbed in this area. The

193

police records of the City and Terminal Police Department disclosed that in the area of the station, and the parking lots east of the station, 39 Part I crimes [1] were committed during the year 1962. An analysis of these disclosed that they consisted of 14 thefts of accessories of the value of $5 or less from cars (one from a bicycle); 5 thefts of accessories of the value of $50 or more from automobiles; 9 automobiles were stolen (7 of which were returned within 48 hours after joy riding); and a building on the West side of 20th Street was burglarized in the night with nothing taken; and 10 arrests were made inside of the station. Of these 10 persons apprehended, 2 were charged for peace disturbance, 3 were removed for loitering, 3 were removed for trespassing, 2 were apprehended for stealing small articles from Harvey's, and 1 was found entering an office in the station building at night. There was testimony by the Chief of Police of the Terminal

---

[1] The records of the police department were divided into two parts. Part I crimes were those of murder, rape, robbery, aggravated assault, burglary, pocket picking over $50, purse snatching over $50, shoplifting over $50, theft from an auto, auto accessory, bicycle larceny, permanent retention of auto theft, and joy riding of auto theft. Part II crimes included prostitution, liquor, drunkenness, narcotics, gambling, forgery and counterfeiting, embezzling, carrying a concealed weapon, sex offenses, crime against family, disorderly conduct, vagrancy and peace disturbance. A record of Part I crimes was available for the area generally described as the south half of Market Street, from 18th to 20th from Market to Clark, and the west half of 18th from Market to Clark and the Union Station area as it would be defined if Clark (parallel to, and approximately 2 blocks south of Market) had been extended through Union Station. The only record of Part II crimes covered the 4th District (approximately 200 city blocks). Plaintiff made an offer of proof, which was denied, to show that some 2,000 Part II crimes occurred in the 4th District in 1962. Statistical data was kept on Part I crimes, showing the block in which they occurred, with other details, but such data was not available on Part II crimes.

Railroad Association, whose office was in the station, that for 15 years previous to this occurrence, no women, to his knowledge and record, had ever been robbed or assaulted in or at the station. The records of the City revealed no crimes against the person in the area, during the year 1962. A record of plaintiff's being robbed was made by the Terminal Police Department within 45 minutes after its occurrence, and had become a permanent part of the City records within 3 hours of the occurrence.

Plaintiff testified that in the six-month period preceding this occurrence that she had "on several occasions" seen railroad detectives taking drunks and undesirables out of Union Station, and that she had observed the person taking coins from coin boxes and lockers in the station accompanied by a detective. The Chief of Police of the Terminal Railroad, who was responsible for policing the station, had 36 employees. They kept "one man on each shift in the Union Station building and one man in the train shed and subway on each shift." He testified that during 1962 there were 35 to 40 arrests, including the 10 Part I crimes shown by the city records, in the entire terminal which included the train shed, coach yard, mail facilities, Railway Express building and subway, (basement beneath the building proper), as well as the station proper.

There was testimony that approximately 7,500 people passed through the station on the day of the attack on plaintiff, and that during 1962 some 85,000 cars had been parked in the parking area on the West side of 20th Street which was operated by the Terminal Association; that the restricted parking area extending 270 feet on the East side of 20th Street, South from Market Street, was supervised by the Terminal, but that the area beyond it, in which plaintiff had parked, was not under the Terminal's control.

Despite the uncontradicted evidence that in 15 years no woman had ever been robbed or assaulted in or at the Union Station, and the uncontradicted evidence that no crimes against the person had been committed in the area during 1962; the fact remains that plaintiff was robbed and assaulted in the area. While we might not conclude from the evidence, that the area was decadent, or that the incidence and nature of the crimes previously committed in the area were of serious consequence; the criminal acts to which plaintiff was subjected, to her, were of serious consequence, and despite evidence of the area being policed, it was not sufficiently policed to protect plaintiff on this occasion.

██ Even though we might reach different conclusions from the evidence presented, our conclusions would not govern when reasonable men have and could conclude otherwise. Whether the jury concluded that the area was decadent, or frequently habituated by persons disposed to crime and violence, or whether the area was not a safe place to park, we are unable to determine. They obviously concluded at least one of these things, and concluded that defendant had not, therefore, furnished plaintiff a safe place to work, and concluded that the danger was one which the defendant should have foreseen. Despite defendant's evidence, the jury may have concluded that the immediate vicinity of the side of a railroad station, on a dead-end street, along a fence between the street and railway tracks, is not a safe place for a woman employee to park her automobile, or be unescorted, with items in her possession that persons might consider to be of value to them; such conclusions might come from their own knowledge and experience, coupled with the slightest of evidence to support them.

██ ██ In this FELA action, federal decisional law governs in determining whether the evidence requires submission to the jury (Rogers v. Missouri Pac. R. Co.,

352 US 500, 77 S Ct 443) and whether negligence and proximate cause are shown (Urie v. Thompson, 337 US 163). In the Rogers case, supra, the Supreme Court of the United States said at 77 S Ct 448–449:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The Statute expressly imposes liability upon the employer to pay damages for injury or death in whole or in part to its negligence.

"The law was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more that the single question whether negligence of the employers played any part, however small, in the

injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference."

Another leading case interpreting the Federal Employers' Liability Act is Gallick v. Baltimore & Ohio R. Co., 372 US 108, 83 S Ct 659. It deals in particular with the function of the jury in FELA cases, and the right of the jury to conclude what is reasonably foreseeable. In that case, the petitioner was a spotting crew foreman working along the railroad's right-of-way. At the particular stretch of roadbed where the petitioner was working on the afternoon in question, there had been for many years a pool of stagnant water. While he was temporarily working near the pool, the petitioner experienced an insect bite on his left leg just above the knee. This wound subsequently became infected and the infection failed to respond to medical treatment and it became necessary to amputate both petitioner's legs. The trial court entered judgment for the petitioner. However, the Court of Appeals reversed and held that judgment for the railroad should have been entered on a directed verdict because the trial evidence was insufficient to support a judgment for the petitioner.

The Supreme Court of the United States in that decision at 83 S Ct 663 said:

"We think that the Court of Appeals improperly invaded the function and province of the jury in this Federal Employers' Liability Act case. According to the Court of Appeals, the break in the causal chain that turned it into a mere 'series of guesses and speculations' was the want of evidence from which the jury could properly conclude that respon-

198

dent's fetid pool had had something to do with the insect that bit petitioner. The only question was whether or not the insect was from or had been attracted by the pool. We hold that the record shows sufficient evidence to warrant the jury's conclusion that petitioner's injuries were caused by the acts or omissions of respondent."

In the Gallick case, the court quoted with approval from Tennant v. Peoria & P. U. Ry. Co., 321 US 29, 64 S Ct 409, to point out that the jury weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instruction and draws the ultimate conclusions as to the facts. It was in Tennant, supra, that the court said:

"That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to re-weigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

As in Gallick, supra, the defendant railroad here has argued that plaintiff's injury was not reasonably foreseeable and therefore there was no negligence. Defendant, in Gallick pointed out that past experience in the area, established that no occurrence of the kind there alleged, either occurred or was known by the defendant railroad to have occurred. In the present case, the defendant urges that it was not aware of any assault on women in the Union Station area prior to the assault on plaintiff; in fact, the evidence was that there had been no attack or robbery in the area in the past year, and no attack upon or robbery of women in the past 15 years, "in or at" the station, and therefore the assault on plaintiff was unforeseeable and the railroad was not negligent.

The Supreme Court answered this contention in Gallick, supra, when at 83 S Ct 667 it said:

"In the second place, in deciding whether respondent had reason to anticipate and foresee any harm to petitioner, the trial court instructed the jury to take into account 'the past experience respecting the location and conditions in question' and the fact 'that no occurrence of the kind here alleged either occurred or was known by defendant to have occurred, at or near this place before August of 1954.' The jury thus might have determined that, since there had been no similar incidence of this pool in the past, the respondent had no specific reason for anticipating a mishap or injury to petitioner—*a far too narrow a concept of foreseeable harm to negative negligence under the Federal Employers' Liability Act.*" (Emphasis supplied.)

■ We recognize that Gallick can be distinguished by the fact that there, the defendant had maintained the stagnant pool on its property near the place where its employees were required to work. Here, defendant has done nothing on its property, or on the public streets of the City of St. Louis, which maintained any hazard to its employee. But we are compelled also to recognize, that in Gallick, the jury by answer to special interrogatories, put themselves on record, as finding that the railroad did not have reason to anticipate that its maintenance of the pool would or might probably result in a mishap or injury; and that the railroad could not foresee that the stagnant pool would set off a chain of events that would culminate in Gallick's injury and permanent disability; while by another interrogatory they determined the railroad to be guilty of negligence. The court, repeating that reasonable foreseeability of harm is an essential ingredient of negligence under FELA, held that this

200

requirement was satisfied by the jury's finding of negligence in maintaining the filthy pool of water. We have no special interrogatories in the present case, and the jury by their verdict has found for the plaintiff and against the defendant, in this case in which they were properly instructed that injury resulting in whole or in part from the negligence of defendant, rendered defendant liable.

██ The Supreme Court in Gallick pointed out that for a defendant to be liable for consequential damages, the defendant need not foresee the particular consequences of the acts or omissions, which the jury found to be negligence, and said that "assuming the existence of a threshold tort against the person, then whatever damages flow from it are recoverable," (83 S Ct 667, citing authorities). Under FELA, where the tortfeasor is liable for injuries incurred by reason of its negligence, even the slightest in nature, the tortfeasor must compensate its victim for even the improbable consequences of its acts or omissions. (Gallick v. Baltimore & Ohio R. Co., supra, and cases cited therein.)

Defendant has urged that Inman v. Baltimore & Ohio R. Co., 361 US 138, 80 S Ct 242, and the cases which it cites, should control the present case. In that case the plaintiff, a crossing watchman employed at defendant's crossing for seven years, was injured when an automobile driven by an intoxicated person passed a line of cars stopped at the crossing and struck plaintiff as he was standing in the middle of the street, a few feet from the tracks, swinging his lantern to warn traffic of the approach of defendant's trains. No accidents had occurred at the crossing during plaintiff's employment, nor had plaintiff ever complained to the railroad that the crossing was unsafe. A judgment in plaintiff's favor was reversed by the Ohio Court of Appeals, and the Supreme Court of the United States affirmed, holding that in the absence of testimony of any similar occurrences and of any com-

plaint to the railroad, that the crossing was an unsafe place to work, there was no proper basis for the jury's verdict, pointing out that the Act did not make the railroad an insurer, and concluded that "the evidence was so thin that, on judicial appraisal, the conclusion must be drawn that negligence on the part of the railroad could have played no part in petitioner's injury."

In view of the language used in the Gallick opinion, which makes no mention of Gallick ever complaining to the railroad about the stagnant pool, filed in 1963, we observe that the Inman opinion was filed 4 years earlier, in 1959, and is cited in the Gallick opinion, as authority for the statement that reasonable foreseeability of harm is an essential ingredient of FELA negligence. It is also interesting to note that in Gallick, as in Inman, the Ohio Court of Appeals reversed the plaintiff's judgment; in Inman the Supreme Court affirmed the Ohio Court and 4 years later reversed it in Gallick—both were cases in which the Ohio Court had reversed a plaintiff's judgment on the theory that there was no negligence, because there was no reasonable foreseeability of harm to the employee.

Defendant also urges that Ambold v. Seaboard Air Line R. Co., 345 F2d 30 (4th Circuit 1965, cert den Oct 11, 1965, 86 S Ct 70) in which a plaintiff was denied recovery. There the court cited Inman as authority for the proposition that FELA does not make the railroad an insurer; there was no evidence of complaint to the railroad, or testimony of similar occurrences. There is a basic difference of facts which distinguishes Ambold from the present case, as in Ambold it appears quite conclusively that plaintiff's negligence was the sole cause of his injuries; Ambold's explanation was that he "simply misjudged the distance and did not take long enough step." In the present case, there is no showing of plaintiff's negligence.

The Inman case was relied upon for the court's decision in Simpson v. Texas & New Orleans R. Co., 297 F2d 660 (5th Cir 1962). The District Court dismissed plaintiff's complaint and the Court of Appeals affirmed the dismissal. The complaint charged that while plaintiff, a messenger, was riding a motorcycle, which the railroad furnished him, from the railroad's office to its terminal to pick up the mail, the motorcycle broke down. The complaint alleged that plaintiff called his supervisor who instructed him to take a bus to the terminal. As plaintiff alighted from the bus in a heavy rain he was struck by an automobile and injured. He charged the railroad was negligent in failing to provide him a safe means of transportation, in not keeping the motorcycle in a safe and workable condition, in not repairing it and in failing to provide plaintiff with proper protection from the weather. There the court held that the chain of causation between the breakdown of the motorcycle and any subsequent occurrence was effectively broken, and that under the circumstances there present, the railroad had no duty to shield its employee from ordinary traffic hazards. In the case at hand, there is no break in the chain of causation, and plaintiff's injuries arose as a result of an occurrence that is considerably more than an ordinary traffic hazard.

Even though this record shows no crimes of a similar nature in the area, reasonable men might be apprehensive of sending a woman, unaccompanied into the area where plaintiff found it necessary to park her car. The Terminal Association had felt it necessary to keep police officers on duty in and at the station at all times due to the diversity of moral character of the many people who use and frequent the area; although the record shows a low incidence of crime, there was a showing of some crimes in the area. We, therefore, cannot

say that the proof does not justify, with reason, the conclusion which the jury obviously drew, that employer negligence played some part, even the slightest, in producing the injury of plaintiff. Accordingly, the trial court, properly denied defendant's motion for a directed verdict, and judgment notwithstanding.

In support of defendant's position that this case should be remanded for a new trial, defendant has complained of two of plaintiff's instructions given by the trial court. The first is Plaintiff's #14, IPI 160.09, which is the FELA, no assumption of the risk, instruction. Defendant, of course, did not, and could not plead assumption of the risk in FELA, and defendant urges it was not an issue in the case. Defendant has cited Gowins v. Pennsylvania R. Co., 299 F2d 431 and De Pascale v. Pennsylvania R. Co., 180 F2d 825; in both those cases the court held it was not error to refuse to give an assumption of the risk instruction in an FELA case; they did not hold it was error to give the instruction. In Gilmore v. Toledo, Peoria & Western Ry. Co., 64 Ill App2d 218, 212 NE2d 117, the railroad argued that the trial court committed reversible error by giving an assumption of risk instruction. The Appellate Court said:

"Appellant contends that since it did not make assumption of risk an issue in the case, it was in error to give the instruction. Although Justice Frankfurter in a specially concurring opinion in Tiller v. Atlantic Coast Line Ry. Co., 318 US 54, 72, 63 S Ct 444, 87 L ed 610, did suggest that such an instruction should not be used, it was not deemed reversible error. (See Larson v. Chicago & N. W. R. R. Co., 7th Cir, 171 F2d 841, 846, and Wantland v. Illinois Central Ry. Co., 237 F2d 921 (7th Cir 1956), although the question was not directly involved in either decision.) Although appellant did not charac-

terize the actions of appellee in terms of assumption of risk, it did however emphasize the duties of appellee and the relationship of these duties to the mishap. Accordingly, we find no error in the giving of this instruction."

Here the evidence showed the length of time plaintiff had been a messenger, her daily route, and her numerous trips to the area, her bidding in the job, her possibility of having bid in other jobs. This was dwelt on in cross-examination, and from it, a jury could have reasonably inferred, that knowing her duties in the job, and the frequency that she visited the area, that she had assumed the risk. The instruction was a proper statement of the law and was properly given, and we hold that the instruction is properly given in an FELA case, if there is any evidence whatsoever from which it could be reasonably inferred that the employee had assumed the risk.

 The second instruction complained of was Plaintiff's #15, IPI 12.04, which was as follows:

"More than one person may be to blame for causing injury. If you believe that the defendant was negligent and that its negligence caused injuries to the plaintiff, it is not a defense that some third person may also have been to blame."

The instruction has since been revised (See 1965 Additions and Revision IPI). Defendant urges that plaintiff's case rested solely upon the theory that her robbery and injury were an integral part of defendant's negligence in requiring her to go to the station area where defendant should have foreseen such an incident would happen, while defendant contended plaintiff's assault was an entirely unforeseeable criminal act for which defendant had no responsibility. Defendant urges that the instruction destroyed its defense of lack of reasonable foreseeability. Defendant has cited no cases supporting his position with

reference to this instruction. We have heretofore in this opinion, pointed out that in FELA, a lack of reasonable foreseeability of the particular consequences of defendant's negligence, does not excuse the railroad from its responsibility, if in fact the jury reasonably found defendant to be negligent, and that negligence contributed to the employee's injury. The jury was entitled to know that even though a criminal act of third parties actually caused the harm, that if the defendant railroad was negligent, then the act of the third parties is no defense to the railroad. The instruction did not tell the jury to consider defendant's negligence separate and apart from the assault—only that if the defendant was negligent as charged, that then the fact that the actual harm was inflicted by third parties was no defense for the railroad. We do not consider the giving of the instruction error.

 The closing arguments of plaintiff's counsel were replete with improper accusations directed to the motives of defendant's counsel in objecting to evidence which the court excluded. Plaintiff offered to prove the incidence of crime in a section of St. Louis referred to by the St. Louis Police Department as the Fourth District, an area of some 200 blocks, bounded by the Mississippi River on the east, Jefferson Avenue on the west, Chouteau Avenue on the south and Maiden Lane on the north, without proof of where in this District any crime had occurred. The court held such evidence was inadmissible and sustained defendant's objection to it. Although the court excluded this evidence, plaintiff's counsel continued to refer to it in closing argument.

When defendant's objection to this argument was sustained, plaintiff's counsel, nevertheless, continued to accuse defense counsel of giving improper information, and not intending to give proper information with reference to the incidence and nature of crimes in the area and asserted that the only defense was a distortion of the

records and facts, and suggested that defense counsel had kept evidence of criminal activity in the area from the jury.

In Forest Preserve Dist. of Cook County v. Alton R. Co., 391 Ill 230, 62 NE2d 701, where evidence regarding the sale price of property was excluded by the trial court and, thereafter, referred to by counsel in closing argument, the court in reversing plaintiff's judgment, held, p 235:

> ". . . With full knowledge that the court had sustained objections to evidence of such fact, counsel made an argument from which the jury could well draw the inference that appellants were withholding evidence from the jury that would be an important factor in determining the compensation to be awarded for the land in question. In arguing a case to a jury, counsel are privileged to discuss the evidence introduced and all reasonable inferences that may be drawn therefrom, but they should not undertake to create a prejudice against the opposing party by arguing that if evidence which the court has held inadmissible had been admitted, it would have been adverse to the opposing party. Such conduct is beyond the scope of proper argument. (Citing cases.) Where the court sustains an objection to a statement of counsel, it is the duty of counsel to desist from further argument of that character. (Citing cases.)"

In addition to improperly commenting on excluded evidence, plaintiff's counsel made unwarranted characterizations of defendant's counsel, in a successful effort to deprive defendant of fair treatment by the jury. Our views with reference to this type of argument are best expressed in Vujovich v. Chicago Transit Authority, 6 Ill App2d 115, 122, 126 NE2d 731:

". . . We feel that the constitutional right of trial by jury is not a license to counsel to indulge in abusive and prejudicial conduct to gain a verdict, nor does it grant any privilege to embarrass, belittle, and abuse an adversary before a jury to such an extent that the hope of the adversary to obtain respectful consideration at the hands of the jury is destroyed or seriously jeopardized."

Plaintifff's counsel went so far as to refer to the political affiliation of one of defense counsel in an attempt to discredit him before the jury. A fair trial is not one in which the jurors' attention is diverted or attracted from or to judicial considerations of the facts and the law, by the unnecessary injection of political questions, regardless of whether their response may be friendly or antagonistic. Bulleri v. Chicago Transit Authority, 41 Ill App2d 95, 190 NE2d 476, p 479.

 Plaintiff's counsel even recited to the jury that only recently in the city of St. Louis a woman "got her finger cut off and killed because they tried to take her ring off of her in the broad daylight"—entirely outside the record and clearly improper.

Although defendant neither offered or referred to any railroad records, and made no suggestion that an employee McMurtrey would be called as a witness, or if called what his testimony would be, plaintiff's counsel told the jury:

"He says that we claim he's jimmied the records. I'm going to prove in just a few minutes in the discussion of damages that he did attempt to jimmy the pay records until we brought in this W–2 form. Had a fellow McMurtrey just foaming at the mouth ready to testify about her working 176 days. We've got a W–2 form showing she worked a lot more than this. I think this is sufficient evidence to let you

feel they are not being square with us on these reports of crime."

To further incite the jury's prejudice against defendant, counsel colored their argument by comments concerning inadequacy of the mileage allowance, failure to give plaintiff 25¢ a day to keep her off the streets and not be harassed "by what everybody knows is happening in these big communities."

Plaintiff seeks to avoid a new trial of this case which her counsel's improper, prejudicial and inflammatory argument necessitates by suggesting that defendant's objections thereto were not timely. She cites Lindroth v. Walgreen Co., 407 Ill 121, 94 NE2d 847, where the court said:

"No objection was made at the time the argument was made, nor was the court requested to take any action regarding the remarks until after the verdict."

Defendant here did not wait until after the verdict to request the court to take action. Defendant made numerous objections to plaintiff's counsel's closing argument, and immediately at its conclusion moved for a mistrial.

Defendant's objections to the closing arguments of plaintiff's counsel were both adequate and timely. Had they been otherwise, the impropriety of such arguments would, nevertheless, be a proper subject for review here. Underwood v. Pennsylvania R. Co., 34 Ill2d 367, 371, 215 NE2d 236.

 Although the court sustained objections to many of the statements which were made, the cumulative effect of the improper and prejudicial argument clearly deprived defendant of the fair trial to which it was entitled.

In Hayes v. New York Cent. R. Co., 328 Ill App 631, 67 NE2d 215, the court said, p 640:

209

"... The general rule is that a judgment obtained by appeals to passion and prejudice and unfair conduct of the plaintiff's attorney will be reversed and remanded for another trial. People v. Bimbo, 314 Ill 449; Coal Creek Drainage & Levee Dist. v. Sanitary Dist. of Chicago, 336 Ill 11, 45. The Federal courts enforce the rule quite strictly. In Minneapolis, St. P. & S. S. M. R. Co. v. Moquin, 283 US 520, the Supreme Court of the United States said:

" 'In actions under the federal statute no verdict can be permitted to stand which is found to be in any degree the result of appeals to passion and prejudice.'

"In New York Cent. R. Co. v. Johnson, 279 U. S. 310, 318, the same court said:

" 'The public interest require that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict uninfluenced by the appeals of counsel to passion or prejudice.' "

Plaintiff's verdict was responsive to the inflammatory and unfair argument of her counsel. A verdict so founded on appeal to prejudice should not stand. The refusal of plaintiff's motion for a new trial was error.

Reversed and remanded.

GOLDENHERSH and MORAN, JJ., concur.