THOMAS A. HAMROCK, Plaintiff-Appellant, v. CONSOLIDATED RAIL CORPORATION, Defendant-Appellee.

First District (1st Division)   No. 85—2082

Opinion filed September 22, 1986.

Laurence C. Acker and John J. Naughton, both of Henslee, Monek & Henslee, of Chicago, for appellant.

William D. Serritella, of Ross & Hardies, of Chicago, for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

On August 25, 1977, plaintiff, Thomas A. Hamrock, was seriously injured while working for defendant, Consolidated Rail Corporation,

on a runaround track in Leetonia, Ohio. He brought suit against the railroad under the Federal Employees' Liability Act (FELA) (45 U.S.C. secs. 51 through 60 (1976)). After a trial, the jury found in favor of defendant and against plaintiff, who now appeals. He claims that the trial court erred in denying his post-trial motions and in refusing to give his jury instruction on assumption of risk. We reverse and remand for a new trial.

On the day of the accident, plaintiff was working as the head brakeman on the SL 1 and 2 train, which delivers and picks up railroad cars at various plants and facilities between the cities of Salem, Lisbon and Leetonia, Ohio. Plaintiff had been a railroad employee since 1960 and had worked as a brakeman on the SL 1 and 2 prior to his accident. The crew of the SL 1 and 2 consisted of an engineer, a fireman, a conductor named James Schiffhauer, a rear brakeman or flagman named Charles Girts, and plaintiff. The conductor was in charge of the train and received the switching instructions from the railroad clerks or agents. The head brakeman performs switching and coupling operations involving the locomotives at the front end of the train, while the rear brakeman performs the same operations involving the caboose and the rear end of the train.

Trains such as the SL 1 and 2 are equipped with air brakes which can be applied by the engineer in the locomotive. A brakeman on the lead car in a shoving movement can also apply the air brakes by turning a valve or angle cock which is attached to a series of air hoses which are connected from car to car. The angle cocks are located close by the coupling mechanism on the end of the car. The need to manipulate directly the angle cock can be eliminated by using a backup hose, which is basically an extended piece of hose which connects at one end to the air hose on the lead car of a shoving movement. The other end of the backup hose has a valve which allows the brakeman to control the speed of the train movement from a safe position.

On the day in question, the crew had boarded the train in Lisbon and proceeded to Leetonia, where they arrived at approximately noon. During the trip, plaintiff rode in the engine while Schiffhauer and Girts rode in the caboose. The caboose was relatively new, having been used for the first time on the previous night. It contained a toilet, table, bunk and water as well as other train equipment including a checklist listing the equipment on board.

Upon arriving at Leetonia, the conductor and flagman came up to the engine to give instructions on the movements to be made. The crew was to drop off 19 cars from Lisbon and then pick up 21 empty hopper cars for delivery to Lisbon. This task involved at least two

coupling maneuvers on the runaround track, which is a section of auxiliary track connected to and running parallel to the main track line. The runaround track in Leetonia was located to the west of the main line, which ran in a north-south direction. On the day in question, because of the ground conditions and poor visibility along the runaround track, the conductor decided to perform the coupling maneuvers using angle cocks on the individual cars rather than by passing hand signals to the engineer. No backup hoses were used. During the coupling maneuver, the train blocked all the railroad crossings in Leetonia. Coupling maneuvers are dangerous and care must be taken to prevent hard coupling which might cause derailment or damage to the contents of a loaded car.

Plaintiff and the engine crew (engineer and fireman) placed the 19 cars from Lisbon on the runaround track. Girts was stationed where the north end of the runaround track joined the main track in order to make another coupling after the first coupling was accomplished by plaintiff. The conductor was in the SL 1 and 2 caboose. Plaintiff and the engine crew coupled the 21 empty cars onto the SL 1 and 2 locomotives and pulled them onto the main line so they could be shoved in a northerly direction and coupled onto the SL 1 and 2 caboose, which was situated on the north end of the runaround track.

Plaintiff walked behind the lead car on the north end of the train and turned the angle cock with his hand to apply the air brake. The angle cock was on the west side of the runaround track. As the train proceeded north, plaintiff boarded the lead car using a side ladder and positioned himself on the small ledge behind the coupling mechanism. He faced away from the car and held onto two upright braces on the front of the hopper. His right foot was on the ledge and his left foot was in position to apply the air brake by manipulating the angle cock. The angle cock was about 12 inches to the left and 6 inches below his right foot. The train had traveled about three car lengths when his right foot slipped on grease that was allegedly covered by coal dust. Although he attempted to regain his balance, he was unable to do so and his right foot was crushed in the coupling.

Conductor Schiffhauer was on the platform of the standing caboose and saw plaintiff on the hopper car. After plaintiff slipped and his right foot was caught, Schiffhauer ran south along the roadway on the east side of the runaround track to the locomotives. He told the engineer to call an ambulance and had the fireman assume a position on the east side of the track so the two of them could relay signals to move the train and free plaintiff. After they did so, plaintiff was taken by ambulance to a hospital. Eventually several of his toes were ampu-

tated.

Upon receiving notice of the accident, the railroad dispatched John R. McCarthy and Charles Guveiyan to conduct an investigation. Both men were specifically instructed to determine whether the SL 1 and 2 caboose was equipped with a backup hose. When the two men arrived in Leetonia at approximately 3:30 p.m. on the day of the accident, they spoke briefly with members of the crew. They then entered the caboose and located a backup hose hanging in an equipment locker. Later that day, they also took a joint statement from the crew.

At trial, plaintiff testified that he boarded the empty hopper car because ground conditions made it impossible to walk along the side of the train on which the angle cock was located in order to reach in and manipulate the angle cock from the side. The ground conditions also prevented the passing of hand signals. Although he initially denied knowing what a backup hose was, he later admitted that he did know how a backup hose was used. However, he denied that he had ever used one. At the time of his accident he was not aware of the backup hose in the caboose. He was familiar with the railroad's safety rules but stated that he and other train men customarily rode moving cars and manipulated the angle cock with their feet.

Conductor Schiffhauer testified that he decided to make the movements using the angle cocks on the individual cars rather than passing hand signals. He stated that each individual crew member exercises his own judgment as to how he will perform his part of the move once the conductor informs them of the move to be made. He further stated that there were different ways to make the move made by the plaintiff in that some men positioned themselves with their backs to the coupling they were trying to make and others would face the coupling, depending on whether they could use their right or left foot to their advantage. He did not know that there was a backup hose in the caboose and he had never been furnished with a backup hose prior to plaintiff's accident. He said that even if he had been given a backup hose he would not have used it because it took too long to hook up and to make the air test with the engineer. He previously requested, but never received, radios which would have enabled the coupling maneuvers to be done safely.

Flagman Girts testified that plaintiff had been making the move in the usual and customary manner under the circumstances when he was injured. Both Girts and other trainmen had made the move in a similar manner. On the day in question, he had intended to accomplish his coupling by walking alongside the car and reaching in to manipulate the angle cock. He stated that he was not aware of a backup hose

in the caboose. He presumed that hand signals could have been relayed if all three men of the ground crew had been involved in making plaintiff's coupling but that would have left no one to make the second coupling. He also requested radios, but had never received one. He also stated that the Leetonia police and fire departments would put pressure on the crew to open the crossings when the crossings were tied up for more than 8 or 10 minutes.

John McCarthy testified that, as a safety supervisor for the railroad, his responsibilities included implementing the railroad's safety program and investigating employee accidents. Based on his investigation of plaintiff's accident and his past experience, it was his opinion that plaintiff's injury was attributable to his failure to comply with the following railroad safety rules:

"1103 (c) Do not stand, sit, walk or ride on *** top of side or end of open top car.

\* \* \*

(n) On any other portion of equipment that does not permit having firm footing and secure handhold."

"1105 (e) When riding on or getting on or off standing or moving equipment *** use only handhold, ladder, step, stirrup or other part designed and placed for the purpose."

1113 Manipulate angle cock on moving equipment only with device that is approved for the purpose."

McCarthy stated that the backup hose was the only approved device to manipulate the angle cock and that it was standard equipment on defendant's cabooses. McCarthy stated that he had worked as a brakeman on various occasions and had used a backup hose in similar situations. He stated that plaintiff had alternative means available to him to perform his jobs and that if the backup hose had been used, the accident would not have happened. He also stated that ground conditions along the east side of the track were suitable to allow hand signals to be passed to the engineer. He admitted that conductors are ultimately responsible for the safety of train movements; however, he believed that the conductor in this accident used poor judgment but did not violate any rules. If he had seen plaintiff in a position on the end of the car, he would have stopped the movement immediately.

At the conclusion of all the evidence, plaintiff made a motion for a directed verdict, which was denied. The trial court then instructed the jury. The court gave a contributory-negligence instruction that modified Illinois Pattern Jury Instruction, Civil, No. 160.02 (2d ed. 1971) (hereinafter cited as IPI Civil 2d) to include language to the effect that plaintiff's contributory negligence could be the sole cause of his

injury and that, if so, he cannot recover. The court refused to give an assumption of risk instruction. (IPI Civil 2d No. 160.09.) The jury eventually found in favor of defendant. Plaintiff's motion for judgment *n.o.v.* or, in the alternative, a new trial was denied. Plaintiff appealed.

In order to recover under the FELA, a plaintiff must show both negligence on the part of the employer and causation; however, "[t]he quantum of evidence necessary to establish liability is much less in a FELA case than it would be in an ordinary negligence case" (*Heater v. Chesapeake & Ohio Ry. Co.* (7th Cir. 1974), 497 F.2d 1243, 1246, *cert. denied* (1974), 419 U.S. 1013, 42 L. Ed. 2d 287, 95 S. Ct. 333); in that the railroad will be liable if its or its agent's negligence played any part, even the slightest, in producing the employee's injury. "It does not matter that, from the evidence, the jury may also within reason *** attribute the result to other causes, including the employee's contributory negligence." *Rogers v. Missouri Pacific R.R. Co.* (1957), 352 U.S. 500, 506, 1 L.Ed. 2d 493, 499, 77 S. Ct. 443, 448.

■ Contributory negligence will not bar a recovery under the FELA (45 U.S.C. sec. 53 (1982)); however, the doctrine of comparative negligence has been retained so that a plaintiff's negligence may diminish the amount of damages recoverable (*Koshorek v. Pennsylvania R.R. Co.* (3d Cir. 1963), 318 F.2d 364, 367). Moreover, the 1939 amendments to the FELA abrogated the defense of assumption of risk in all cases where the injury resulted from the negligence of the carrier. 45 U.S.C. sec. 54 (1982), (53 Stat. 1404 (1939)); *Tiller v. Atlantic Coast Line R.R. Co.* (1943), 318 U.S. 54, 87 L. Ed. 610, 63 S. Ct. 444.

■ Review by State courts of jury verdicts in FELA cases is to be made in accordance with Federal law. (*Bowman v. Illinois Central R.R.* (1957), 11 Ill. 2d 186, 142 N.E.2d 104, *cert. denied* (1957), 355 U.S. 837, 2 L. Ed. 2d 49, 78 S. Ct. 63.) Under Federal law in FELA cases, a jury verdict will be set aside "[o]nly when there is a complete absence of probative facts to support the conclusion reached." (*Lavender v. Kurn* (1946), 327 U.S. 645, 653, 90 L. Ed. 916, 923, 66 S. Ct. 740, 744.) Moreover, "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry. Co.* (1944), 321 U.S. 29, 35, 88 L. Ed. 520, 525, 64 S. Ct. 409, 412.

■ In reviewing the trial court's denial of plaintiff's motion for judgment notwithstanding the verdict in a FELA case, the sole issue presented on appellate review is whether there is any evidence, considered in a light most favorable to defendant, that supports the verdict. (See *Finley v. New York Central R.R. Co.* (1960), 19 Ill. 2d 428,

167 N.E.2d 212; *Hall v. Chicago & Northwestern Ry. Co.* (1955), 5 Ill. 2d 135, 140-41, 125 N.E.2d 77.) Applying these guidelines in the case at bar, we cannot say that there is a total failure or lack of evidence supporting the jury's verdict in favor of the railroad.

■ For the purposes of our review of the trial court's denial of plaintiff's motion for judgment *n.o.v.*, there was evidence in the form of testimony by conductor Schiffhauer and McCarthy that plaintiff alone elected to position himself in the moving car during the switching maneuver in violation of company safety rules and that his negligence was the sole cause for his injury. In particular, testimony that plaintiff had safe alternative methods available to him and that the accident would not have occurred except for his actions, while not necessarily conclusive, was sufficient to preclude setting aside the jury's verdict. The fact that there may have been evidence in the record which would have supported a finding of negligence on the part of the railroad is immaterial since the evidence was sufficiently contested to preclude the trial court from taking the case from the jury and, on review, we may not substitute our judgment for that of the jury since there is evidence in the record supporting the jury's verdict.

Plaintiff asserts that the trial court committed reversible error in refusing to give an "assumption of risk" instruction. This instruction, using statutory language, essentially would have told the jury that the defense of assumption of risk is not available to a defendant in a FELA case. (IPI Civil 2d No. 160.09.) The trial court refused the "assumption of risk" instruction, in part, to prevent jury confusion. The court also precluded plaintiff from arguing this issue during closing arguments.

■ A court's charge to the jury will be deemed proper only where it adequately and correctly covers the substance of the requested instructions and is fair to both parties. *Ybarra v. Burlington Northern, Inc.* (8th Cir. 1982), 689 F.2d 147.

■ We recognize that the use of an assumption-of-risk instruction in an FELA case has been condemned by various courts where assumption of risk was not at issue in the case and the jury was properly instructed on contributory negligence. (*Heater v. Chesapeake & Ohio Ry. Co.* (7th Cir. 1974), 497 F.2d 1243, 1249; *Seaboldt v. Pennsylvania R.R. Co.* (3d Cir. 1961), 290 F.2d 296, 300; see also *Tilly v. Atlantic Coast Line R.R. Co.* (1943), 318 U.S. 54, 72-73, 87 L. Ed. 610, 620, 63 S. Ct. 444, 453-54 (Frankfurter, J., concurring).) However, courts have noted that assumption of risk and contributory negligence are closely related concepts and that a clear distinction must be made between the two in order to avoid jury confusion and to protect the

plaintiff from being charged with assumption of risk under a different name. (*Koshorek v. Pennsylvania R.R. Co.* (3d Cir. 1963), 318 F.2d 364, 369-70; *Mumma v. Reading Co.* (E.D. Pa. 1965), 247 F. Supp. 252.) Courts have made the distinction on the basis that assumption of risk will not bar recovery where plaintiff merely performs a dangerous job with knowledge of the danger and without a safe alternative available to him, while contributory negligence involves some negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition. *Koshorek v. Pennsylvania R.R. Co.* (3d Cir. 1963), 318 F.2d 364, 367; Prosser, Torts, sec. 68, at 441 (4th ed. 1971); see also *Hall v. American Steamship Co.* (6th Cir. 1982), 688 F.2d 1062, 1065-66 (decided under Jones Act).

■ Courts have held that an assumption-of-risk instruction should not be given as a matter of routine in every case, but it is properly given when the issue of assumption of risk is expressly or implicitly before the jury, even though not explicitly raised at trial. (*Clark v. Burlington Northern, Inc.* (8th Cir. 1984), 726 F.2d 448; *Harp v. Illinois Central Gulf R.R. Co.* (1977), 55 Ill. App. 3d 822, 826, 370 N.E.2d 826, *cert. denied* (1978), 71 Ill. 2d 598; *Vandaveer v. Norfolk & Western Ry. Co.* (1966), 78 Ill. App. 2d 186, 205, 222 N.E.2d 897.) The issue of assumption of the risk is before the jury whenever there is any evidence from which it could be inferred that the employee had assumed the risk. *Harp v. Illinois Central Gulf R.R. Co.* (1977), 55 Ill. App. 3d 822, 826, 370 N.E.2d 826; *Vandaveer v. Norfolk & Western Ry. Co.* (1966), 78 Ill. App. 2d 186, 205, 222 N.E.2d 897.

Plaintiff contends that the issue was before the jury because defendant's defense was nothing more than an assumption-of-risk defense under a different name. The railroad claims its defense was that plaintiff alone elected to violate railroad safety rules by choosing the most dangerous method by which he performed his part of the train movement where safe alternatives were available to him. Plaintiff argues that his actions, which defendant asserts were negligent and the sole cause of his injury, were merely assumptions of the risk.

■ Although there was no testimony that plaintiff was given directions or orders to work in the manner he did, plaintiff testified that he used the only method available to him. His superior, conductor Schiffhauer, decided to use air and not to pass hand signals. Every member of the ground crew denied being aware of the backup hose in the caboose, and the conductor stated that he would not have used one even if he had been aware of it. There was also testimony by members of the ground crew that backup hoses were never used and that brakemen customarily positioned themselves on moving cars and turned the

angle cock with their feet. The fact that this may have violated safety rules did not establish negligence as a matter of law (*Teets v. Chicago, South Shore & South Bend R.R.* (7th Cir. 1956), 238 F.2d 223, 226), or that his actions were the sole cause of his injuries, particularly in light of evidence that the rules were seldom utilized or were nullified by custom (*Ybarra v. Burlington Northern, Inc.* (8th Cir. 1982), 689 F.2d 147; *Wantland v. Illinois Central R.R. Co.* (7th Cir. 1956), 237 F.2d 921, 924). Because there was support in the record for plaintiff's theory that he merely performed a dangerous job under orders and in the customary manner without safe alternatives available to him, there was evidence from which the jury could have reasonably inferred that plaintiff assumed the risk and a cautionary instruction should have been given. Moreover, defendant's attempt to show that the sole cause of plaintiff's injury was his own carelessness by emphasizing plaintiff's years as a brakeman, his familiarity with the coupling maneuver, and his knowledge of the condition of the yard underscores the need for a cautionary instruction in this case.

■ An assumption-of-risk instruction would have served to dispel potential confusion of the jury relating to the nature of the task which plaintiff was to perform and the requirement that he perform it. The absence of the instruction left the jury with no basis on which to distinguish between those aspects of plaintiff's conduct which could legitimately limit recovery and that conduct which constituted assumption of risk and could not preclude or limit recovery. It is irrelevant that assumption of risk was never explicitly raised as a defense, because it was an issue in the case and an appropriate instruction was supported by evidence in the record. The proferred instruction accurately stated the law and no other instruction incorporated that feature of the law.

■ Because the evidence in the case was hotly contested, it was vitally important that the jury be properly instructed. Had the jury been adequately instructed on this point, it might well have reached a different verdict. Therefore, the failure to give an assumption of risk instruction constituted reversible error under the circumstances of this case. The judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

QUINLAN, P.J., and BUCKLEY, J., concur.