Pearl **THOMAS**, Administratrix of the Estate of Lewis Samuel Thomas, Deceased,

v.

**CONEMAUGH & BLACK LICK RAILROAD COMPANY**, Appellant.

No. 11740.

United States Court of Appeals Third Circuit.

Argued Feb. 9, 1956.

Decided June 11, 1956.

Thomas W. Pomeroy, Jr., Pittsburgh, Pa., John K. Tabor, Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., for appellant.

Louis C. Glasso, Pittsburgh, Pa., for appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

The defendant railroad having suffered judgment against it below on a jury's verdict, and its motions for judgment or a new trial having been denied, has brought this appeal, raising mainly the issue as to whether there was any evidence in the record upon which the jury could have found negligence on its part which contributed to the death of its employee.

Lewis Samuel Thomas, an employee of the Conemaugh & Black Lick Railroad Company, was killed on July 9, 1954. His

widow, as administratrix, sued the railroad company under the Federal Employers' Liability Act[1] for the damages resulting from his death.

At the time of his death decedent was 47 years old. In addition to his widow he was survived by seven children ranging in age from two to sixteen years. The jury, after finding the decedent was guilty of contributory negligence rendered a verdict for $80,000 against the defendant railroad.[2]

The facts are set forth in detail in the District Court's opinion, D.C.W.D.Pa. 1955, 133 F.Supp. 633. They may be summarized as follows:

The decedent was employed as a skip hoist operator or "tipple man". On July 9, 1954, about two hours after he reported for duty, the decedent was found dead at the bottom of a pit, which was part of the hoisting equipment and structure, under a steel bucket weighing 1950 pounds. He had a deep laceration of the forehead which exposed the skull bone; severe abrasions of the upper chest; his hair was matted with blood and his shirt was open and rolled up his chest. When found the decedent was lying partly in water which had accumulated in the pit; a shovel was also found in the pit at the same time. Decedent's duties required him, from time to time, to descend into the pit to remove debris and lubricate a sliding door mechanism in the pit. Iron guard rails surround the opening of the pit. To get into the pit, steel rungs are provided and they are embedded in concrete. There are six on the vertical wall spaced twelve inches apart and ten on the slopping wall spaced eighteen inches apart. The fourth, ninth, and tenth rungs on the sloping wall were completely missing (rusted off) and the fifth was broken and bent flat against the concrete. A rope was attached to a rung at the bottom of the vertical wall for use to descend into the pit. There was no permanent electric light in the pit; there was no electric switch in the pit by which to control the hoist; there was no space or recess in the pit sufficient for a man to stand if the bucket were also in the pit at the end of its travel.

The decedent's primary duty as a tipple man was to unload sand from railroad hopper cars to a storage bin by operating a skip hoist, also known as a "tipple conveyor", by means of its electric control switches. The essential element in the skip hoist operation is a bucket which runs on vertical tracks or guide rails from a pit beneath the hopper car where it is filled with sand to the top of the adjacent storage building where it empties itself. It is suspended by a cable which is controlled and powered electrically. The electric motor and related equipment, including the cable drum and control switches, are located in the ground level of the storage building beside the pit, in a room known as the "hoist house".

The bucket can be operated automatically by pushing the "on" button and the "hoist" or "lower" button located inside the hoist house. When these buttons are depressed the bucket will operate cycle after cycle (from pit to top and back) continuously until stopped by pushing another button called the "safe" button. When depressed the "safe" button stops the bucket wherever it may be. Inside the hoist house there is a cable control switch called a slack switch which shuts off the motor if for any reason the bucket hits an obstruction.

There is also an auxiliary push button switch on the outside wall of the hoist house near the pit opening which is spring operated. If the controls inside the hoist house are "on" and the outside push button is in the "out" position, the bucket will make cycle after cycle from the pit to the top of the storage building and back again. When the auxiliary push button is pushed in and held in a depressed position the bucket will con-

1. 45 U.S.C.A. § 51 et seq.

2. In answer to interrogatories the jury found the total amount of damages to be $100,000, but attributed 20 percent of the negligence to the decedent, reducing the verdict to $80,000.

tinue in its cycle until it reaches the bottom of the pit where it will stop and remain until the button is released. The outside push button can be held in the depressed position by turning it clockwise.

At the trial the plaintiff advanced three separate contentions:

(1) The outside auxiliary push button was defective and vibrations from surrounding blast furnaces and movements of railroad engines caused it to pop out from its depressed position thereby putting the bucket in operation and caused it to come down upon the decedent; (2) the failure of the defendant to provide and maintain a reasonably safe place for decedent to work in that there was no light in the pit; some of the rungs were missing and another was defective; there was no control switch in the pit by which a workman could control the movement of the bucket in the event it was started by some intervening agency; there was no clearance for the protection of the workmen in the pit; (3) someone had started the bucket in motion by operating the controls inside the hoist house while decedent was cleaning the pit.

Expert testimony was adduced by the plaintiff to the effect that the outside auxiliary push button was "unsafe"; that it lacked a device necessary to hold it in the depressed position; that the plate which housed the button was not properly aligned and the thread of the button hole was stripped. Plaintiff's witnesses further testified that "heavy vibration" prevailed in the vicinity of the hoi t house by reason of the operation of blast furnaces and movements of railroad engines and cars. There was also ample testimony, undisputed by the defendant, as to conditions prevailing in the pit itself.

The sum of the defendant's position at the trial was that incontrovertible physical facts negatived the contentions advanced by the plaintiff; that plaintiff had failed to adduce sufficient evidence to sustain any of its contentions; that if there was any negligence on defendant's part with respect to conditions in the pit, it was not the proximate cause of decedent's death.

On this appeal the defendant urges that the weight of credible evidence was so overwhelmingly in its favor that the trial court erred in failing to hold that the jury verdict was arbitrary and capricious.

We do not subscribe to the defendant's view.

■ As to proof of negligence, there was, in our opinion, sufficient to present a jury question. There was testimony which would warrant a jury finding that the outside auxiliary push button was defective, and that it had popped out as a result of heavy vibrations in the vicinity of the hoist house. There was also sufficient testimony to warrant a finding that the pit was not a reasonably safe place for decedent to work and that the conditions there prevailing were a proximate cause of decedent's death.

■ As was said in Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. [Citing cases.] That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the

evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

With respect to the defendant's contention that "all the theories advanced by plaintiff * * * required speculation by the jury" it need only be stated that existence of such "speculation" does not invalidate the jury's verdict where "there is an evidentiary basis" for the verdict.

In Lavender v. Kurn, 1946, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 it was held that:

"*It is no answer to say that the jury's verdict involved speculation and conjecture.* Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. *Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear.* But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (Emphasis supplied.)

In Eckenrode v. Pennsylvania R. Co., 1948, 335 U.S. 329, 330, 69 S.Ct. 91, 92, 93 L.Ed. 41, the scope of appellate review in cases similar to that here involved was succinctly spelled out as follows:

"There is a single question presented to us: Was there any evidence in the record upon which the jury could have found negligence on the part of the respondent which contributed, in whole or in part, to Eckenrode's death?"

Under the holding in that case if upon consideration of the record there is "evidence" or any "inference which may reasonably be drawn from the evidence", which "when viewed in a light most favorable to the petitioner (plaintiff)" can sustain a recovery, the jury's verdict cannot be disturbed.

In the instant case, as already indicated, there was in the record, "evidence" or "inferences" reasonably drawn from the evidence, from which the jury could have found negligence on the defendant's part which contributed to the decedent's death.

An illuminating guide is afforded us in the latest expression of the Supreme Court on the subject of the jury function in Employers' Liability Act cases, Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 525, 526, 76 S.Ct. 608, 610. It was there said:

"In considering the scope of the issues entrusted to juries in cases like this, it must be borne in mind that negligence cannot be established by direct, precise evidence such as can be used to show that a piece of ground is or is not an acre. Surveyors can measure an acre. But measuring negligence is different. * * * Issues of negligence, therefore, call for the exercise of common sense and sound judgment under the circumstances of particular cases. * * * Fact finding does not require mathematical certainty. Jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn."

There remains for disposition several other points raised by the defendant on this appeal.

■■ It assigns as error the admission into evidence of a Coroner's death

**434**

certificate and return of view as proof of the cause of death. The certificate of the Coroner is required under Pennsylvania law[3] and under Federal law is admissible into evidence.[4] A long line of cases support the view that the documents kept in the ordinary course of business are admissible to show the truth of the facts included therein. Norwood v. Great American Indemnity Co., 3 Cir., 1944, 146 F.2d 797; Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1950, 183 F.2d 467; Meth v. United Benefit Life Ins. Co., 3 Cir., 1952, 198 F.2d 446. The District Court properly instructed the jury that the death certificate was admissible; was open to contradiction and was not binding upon the jury.

As a further assignment of error, defendant points to certain hypothetical questions which the Court permitted the plaintiff to ask two expert witnesses. The record indicates that the Court properly exercised its discretion in allowing this line of questioning. Defense counsel was given ample opportunity to review the wording of the questions, and the scope of the questions was restricted to evidence which had already been admitted. The questions related to technical problems which were particularly within the experience of the expert witnesses and beyond the knowledge of the average juror. See Sanders v. Glenshaw Glass Co., 3 Cir., 1953, 204 F.2d 436, certiorari denied, 1953, 346 U.S. 916, 74 S.Ct. 278, 98 L. Ed. 411. We find that their submission was not prejudicial error.

We find without basis defendant's contention that the District Court committed prejudicial error in its charge to the jury.

We see no merit in the defendant's contention that the verdict was excessive. The verdict was certainly not so large "as to shock the judicial conscience." See McKee v. Jamestown Baking Co., 3 Cir., 1952, 198 F.2d 551,

556; Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825, 830.

For the reasons stated the judgment of the District Court will be affirmed.

---

3. Act of June 7, 1915, P.L. 900, § 8, 35 P.S.Pa. § 458.

4. Uniform Business Records Act, 28 U.S.C. § 1732.