**O. P. TEETS, Plaintiff-Appellant,**

v.

**CHICAGO, SOUTH SHORE AND SOUTH
BEND RAILROAD, Defendant-
Appellee.**

No. 11684.

United States Court of Appeals
Seventh Circuit.

Nov. 5, 1956.

Rehearing Denied Dec. 10, 1956.

John C. Mullen, Solomon Sachs, Chicago, Ill., Gerald M. Chapman, Chicago, Ill., of counsel, for appellant.

Oswell G. Treadway, Joseph H. Hinshaw, Leonel I. Hatch, Jr., Chicago, Ill., for appellee.

Before MAJOR, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for injuries sustained by plaintiff, Otis P. Teets, an employee of the defendant, Chicago, South Shore and South Bend Railroad (hereinafter referred to as the Railroad).

The jury found the Railroad guilty of negligence, and assessed plaintiff's damages at $8,500.00. The Railroad moved pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to have the jury's verdict, and the judgment entered thereon, set aside and to have judgment entered in accordance with its motion for a directed verdict.

The trial judge granted the motion for judgment notwithstanding the verdict and filed a memorandum opinion in which he stated: " * * * I therefore hold as a matter of law that the plaintiff utterly failed to establish any negligence on the part of the defendant and that the plaintiff's own negligence was the sole, proximate cause of the accident in question."

When ruling on a motion by the defendant for a directed verdict the trial court may consider only the evidence favorable to the plaintiff and all reasonable inferences which the jury may draw therefrom which tend to support the plaintiff's case. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610. Under this standard the trial judge is precluded from passing on the credibility of witnesses or weighing the conflicting evidence. Lavender v. Kurn, supra; Tennant v. Peoria & P. U. Ry. Co., supra.

Thus, if there is a choice of conflicting versions of the way the accident happened, the decision as to which witness is telling the truth, and inferences to be drawn from uncontroverted as well as controverted facts are for the jury. Stanford v. Pennsylvania Ry. Co., 7 Cir., 171 F.2d 632.

The question in the instant case is: whether there was sufficient evidence to justify submission of the case to a jury. Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497, rehearing denied 336 U.S. 940, 69 S.Ct. 744, 93 L.Ed. 1098.

The plaintiff had been employed by the Railroad for a period of 28 years and during this time he had served exclusively as a motorman or engineer. On March 4, 1952, the date of the accident in question, plaintiff was operating Train No. 29, as he had done for approximately four years.

On the night of the accident Train 29 left the Randolph Street station, Chicago, Illinois, at 5:17 P. M. and proceeded eastward towards South Bend, Indiana. It was standard practice that Train 29 would unload its Gary passengers at Gary, Indiana, and receive Train 203's through passengers for points east of Gary—Train 203 had left the Randolph Street station about nine minutes prior to Train 29's departure.

Train 203 upon reaching the Gary station was sidetracked onto Track 2, a siding immediately north of and parallel to the eastbound main line. This was standard operating practice of which plaintiff was aware. Train 29, on the other hand, was to remain on the eastbound main line into the Gary station where it

was to stop and discharge and receive passengers. The switch controlling entry onto Track 2, which had been opened to permit Train 203 to enter the siding, was open as Train 29 approached the switching point and Train 29 went onto Track 2 and collided with the rear of Train 203.

Between what is called the Pennsylvania overhead and the Gary station there are four signals controlling the approach of eastbound trains. They are, going east, a signal just east of the overhead, Signal 593 at Marshall Street, Signal 591 at Monroe Street, and what is called a "low switch stand" signal. It is only the latter three signals which are of importance in this case.

Signal 593 is approximately $7/8$ of a mile west of the Gary station. It is 21 feet in height, and on the top of its mast is an order board with three color units in a vertical position. The top unit is green and is about 18 feet above the rails, the bottom unit is red and is about 16 feet above the rails, and the middle unit is yellow. Rule 10 of the Railroad's operating rules provides that red is an indication to stop; yellow, an indication to proceed at restricted speed; and green, an indication to proceed.

Signal 591 is identical to Signal 593 except that there is an additional order board about three feet below the top order board. The lower order board contains two color units in line vertically; the top unit is yellow and the lower unit is red. If the signal on the top order board is yellow—the signal on the lower order board would be red—this is an indication that the eastbound main is clear. If the signal on the lower order board is yellow—the signal on the top order board would be red—the engineer would expect the switch in question to be open. The operating rules provide that a train receiving this latter signal should proceed at restricted speed.

The low switch stand, which is approximately 639 feet east of Signal 591, is three feet in height. This signal indicates the position of the switch at Track 2. It contains a red unit that indicates the switch is open and a green unit that indicates the switch is lined for the eastbound main.

Signals 593 and 591 are interrelated with the switch at Track 2 so that when the switch is open, in addition to the red signal that appears on the low switch stand, appropriate colors appear on Signals 593 and 591 indicating this condition. There is no contention that the signal system was not functioning properly at the time of this accident.

It was dark when Train 29 reached the Pennsylvania overhead and the lights of the train were illuminated. It had been raining, sleeting and snowing but had stopped before Train 29 reached that point.

The plaintiff testified as follows: that from the time he left the Randolph Street station to the sequence of events surrounding the accident his trip was uneventful and that Train 29 appeared to be in perfect working order. As he came down the Pennsylvania overhead he observed Signals 593 and 591 to be green— the engineer's position on this train is to the right of center on the lead car. As Train 29 passed Signal 593 it was travelling at the maximum authorized speed for this area, i. e., 45 miles per hour, and Signal 591 was still green. After passing Signal 593 and at approximately 300 feet west of Monroe Street plaintiff's attention was attracted by an automobile which was apparently "stuck" on the westbound track. There were some men trying to push the auto off the track and plaintiff sounded his whistle. He further testified that about 250 feet from Signal 591 he observed this signal to be green but that as he passed 591 he "got a glimpse" of yellow on the signal board. He did not know whether it was "high" yellow or "low" yellow. If it had been high yellow the switch would have been lined for the eastbound main but if it had been low yellow the switch would have been open and the operating rules required that he then proceed at restricted speed.

■ It may be noted that the violation of a company rule does not constitute negligence or contributory negligence as a matter of law. It is for the jury to determine whether a violation of such rule is a proximate cause which contributed in part or whole to the accident. Healy v. Pennsylvania R. Co., 3 Cir., 184 F.2d 209, certiorari denied 340 U.S. 935, 71 S.Ct. 490, 95 L.Ed. 674, rehearing denied 341 U.S. 912, 71 S.Ct. 620, 95 L.Ed. 1348; Thomas v. Conemaugh Black Lick Railroad, D.C., 133 F.Supp. 533, affirmed, 3 Cir., 234 F.2d 429.

Train 29 was travelling at approximately 35 miles per hour as it passed Signal 591. Plaintiff had begun to brake the train preparing to stop at the Gary station and he testified that he "had all the air in the train [he] could get in it to stop at the depot."

At Signal 591 a three degree curve in the trackage begins and plaintiff testified that the low switch stand could not be seen until the train was between 200 to 260 feet distant from this signal.

Plaintiff testified that immediately upon seeing the red indication on the low switch stand he "threw the train into emergency" and the train started to slide because the rail was bad, i. e., a greasy rail. The train continued past the open switch and collided with the rear of Train 203—at the time of the impact Train 29 was travelling at a speed of approximately 12 miles per hour.

The Railroad's Operating Rule 104 provides, in part:

"Conductors are responsible for the position of switches used by them and their trainmen except where switch tenders are stationed. Switches must be properly lined after having been used. *A switch must not be left open for a following train, unless in charge of the trainmen of such train.*" (Emphasis added.)

It is the plaintiff's contention that the Railroad, through its agent, Luscomb, opened the switch in question without giving adequate warning to Train 29; and that Luscomb threw the switch "in the face of" Train 29 although an indicator on the low switch would show that Train 29 was in the block immediately west of that switch. In support of this charge plaintiff argues that Luscomb violated the above quoted rule by not relining the switch for the eastbound main.

The trial judge in his memorandum opinion stated that:

"The conclusion is that plaintiff completely disregarded the signal at 591 after having observed it from 250 feet west, and that he assumed that it would remain green, as normally was the case."

When plaintiff could have or should have first observed the yellow signal at 591 is clearly a question of fact. Witness Luscomb, called on behalf of the Railroad, testified that after opening the switch to permit Train 203 to enter the siding, he did not thereafter change the switch. He further testified that there was a two minute interval between opening the switch and the collision.

At an average speed of 15 miles per hour (which is probably low in view of plaintiff's testimony that Train 29 was travelling at 12 miles per hour at the time of the collision and had been travelling 35 miles per hour when plaintiff applied the emergency brake some 400 feet beyond Signal 591) this would have placed Train 29 approximately ½ mile west of the point of impact when the signals should have registered that the switch was open. Yet plaintiff testified that about 250 feet from Signal 591 he observed this signal to be green which would have placed Train 29 less than ⅕ of a mile west of the collision scene.

The jury would have been completely justified in finding that the interval between the opening of the switch and the collision was less than two minutes.

The trial judge continued, however:

"Assume, however, for the purpose of argument, that signal 591 was changed to yellow as the plaintiff came abreast of it, the plaintiff, on

cross examination, admitted that although he got a glimpse of yellow at 591, he nevertheless continued to within 200 feet from the low switch stand not knowing whether the signal displayed at 591 was a high or low yellow. * * * There can be no serious doubt that a reasonably prudent engineer in the instant situation would have acted in a different manner than the plaintiff herein. He would have treated the signal at 591 as requiring the more cautious conduct of the two alternative possibilities."

At a speed of 35 miles per hour approximately 8½ seconds elapsed from the time plaintiff got a glimpse of yellow at Signal 591 and applied his emergency brake upon seeing the red indication on the low switch stand—during which time Train 29 travelled about 440 feet. It is not clear to us that such conduct was so unreasonable that the trial court could conclude as a matter of law that plaintiff did not respond to the situation as a reasonably prudent engineer would have done.

Plaintiff testified that prior to applying the emergency brake he already had his brake on, that he "had all the air in the train [he] could get in it to stop at the depot." Although the plaintiff said that he did not set the brakes any harder after catching a glimpse of yellow at Signal 591, the jury may have inferred that the only additional braking power was the emergency brake. A reasonably prudent engineer could have well thought that the situation did not call for the application of the emergency brake at Signal 591. The very appellation "emergency brake" implies that its use is limited to an emergency. In view of the danger to the passengers on a train when the emergency brake is applied, plaintiff's delay in using the emergency brake should not have been held to constitute negligence as a matter of law.

■ And finally, assuming that plaintiff's conduct admits of patent negligence, nevertheless, that fact does not necessari-ly bar a recovery. 45 U.S.C.A. § 53. If the Railroad, through its agents, was also guilty of negligence which was a contributing cause, whether antecedent or subsequent to plaintiff's negligence, recovery is not barred.

■ As we pointed out above, there is a switch indicator within five or six feet of the low switch stand which indicates to the man throwing the switch that the block between Signals 593 and 591 is occupied by a train. There was testimony that Train 29 was in the block between Signals 593 and 591 when switch tender Luscomb threw the switch. Therefore, the jury could have found that he knew or should have known that unless the switch was relined or unless plaintiff received the appropriate signal in time Train 29 would enter the siding occupied by Train 203.

Plaintiff testified that as the low switch stand came into view he observed Luscomb running across his track coming from the direction of the switch. Although Luscomb testified that he did not hear or see Train 29, it might have been still possible for him to have relined the switch and thereby have avoided the collision.

Rule 718 of the Railroad's operating rules provides that:

"Any employee observing a condition which may result in an accident or interruption of train operation must make prompt report and if necessary arrange proper protection."

This rule would appear to be more than applicable to Luscomb who was the tender for this switch. Whether he violated this rule and whether in case of violation, the violation was a proximate cause which contributed in whole or in part to the accident was a question for the jury. Thomas v. Conemaugh Black Lick Railroad Co., D.C., 133 F.Supp. 533, affirmed, 3 Cir., 234 F.2d 429; Frabutt v. New York, C. & St. L. R. Co., D.C., 88 F.Supp. 821.

The testimony of witnesses called on behalf of the Railroad was in conflict with plaintiff's testimony in certain respects.

Henry Lochmaier, the engineer on Train 203, testified that the rails were dry whereas plaintiff testified that they were wet. Lochmaier further testified that when he stopped at Signal 591 he could see the signal at the low switch stand whereas plaintiff testified that the low switch stand could not be seen until within 200 to 260 feet of it. It is also true that some of plaintiff's testimony was contradictory of other testimony he gave and of prior statements he had made. The Railroad introduced a statement signed by the plaintiff on June 13, 1952, in the presence of the Superintendent of Transportation for the Railroad and Galvin T. Acres, General Chairman of the Brotherhood of Locomotive Firemen and Enginemen, wherein plaintiff stated that he misinterpreted the signal indication to be yellow over red rather than red over yellow. Plaintiff testified that he signed this statement in order "to get back to work."

It was within the jury's province to resolve whatever conflict in evidence arose and to decide the issue of credibility and weight that the statement signed by plaintiff presented. Stanford v. Pennsylvania Ry. Co., 7 Cir., 171 F.2d 632. As was said in Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, at page 35, 64 S.Ct. 409, at page 412, 88 L.Ed. 520:

> "It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. *The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable.*" (Emphasis added.)

A review of the record convinces us that there was sufficient evidence to require submission of the case to the jury. Accordingly, the order and judgment thereon are reversed and the cause is remanded to the District Court for further proceedings consistent with this opinion.

Reversed and remanded.