Doris E. ALTAMURO, Administratrix of the Estate of Joseph S. Altamuro, Deceased

v.

The MILNER HOTEL, INC.

and

City of Philadelphia.

Civ. A. No. 79–2936.

United States District Court, E. D. Pennsylvania.

March 24, 1982.

Ronald Ervais, Philadelphia, Pa., for plaintiff.

George J. Lavin, Jr., Philadelphia, Pa., for defendant, Milner Hotel.

Timothy J. Galanaugh, Philadelphia, Pa., for City of Philadelphia.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

This is a diversity case brought by Doris E. Altamuro, administratrix of the estate of her husband, Joseph S. Altamuro, against the defendant, Milner Hotel, Inc. ("Hotel"),

for damages for the death of her husband resulting from the inhalation of fumes and carbon monoxide while attempting to rescue residents of the Hotel during a three-alarm fire that occurred there on October 11, 1978.

Seeking contribution and/or indemnity, the Hotel joined the City of Philadelphia as a third-party defendant alleging that the City's policemen and firemen were in exclusive control of the Hotel during the fire and that the City's negligence caused Mr. Altamuro's death. The matter was tried before the Court without a jury on November 24–25, 1981.

Upon consideration of the evidence and the briefs and arguments of counsel, the court makes the following:

## FINDINGS OF FACT

1. The Milner Hotel is located at 111 South 10th Street in Philadelphia, Pennsylvania and is owned by the defendant The Milner Hotel, Inc., a corporation maintaining its registered office at 1526 Center Street, Detroit, Michigan.

2. During the morning of October 11, 1978, Patricia DeLoss, a guest in Room 706 at the Hotel, went to the Hotel's Lobby and there told the Desk Clerk, William T. Wilson, that the television in her room was not receiving a picture and requested that it be repaired. After speaking to Wilson, Ms. DeLoss left the Hotel.

3. Wilson then summoned Edwin Jennings, the maintenance man employed by the Hotel, and instructed him to proceed to Ms. DeLoss' room on the seventh floor to inspect the television.

4. Mr. Jennings went to Room 706 and turned the power-switch of the television to the "on" position, but the switch did not activate the set.

5. Jennings then moved the television and placed the plug into another receptacle in the same room. When he did this, the television began to emit a "burning" odor and made a "popping" or "crackling" sound. Jennings removed the plug from the receptacle and then placed the television in its former position reinserting the plug into the original receptacle with the power switch still in the "on" position.

6. Jennings then returned to the Lobby and reported to Wilson that he thought the television had a "short" in it. In response, Wilson asked Jennings if he turned the television off. Jennings replied, "No, I don't think I did." Wilson then told Jennings to return to Room 706 and turn off the TV set. As Jennings began to ascend the stairs, an unidentified man came in and stated that there was smoke coming out of one of the Hotel's windows on the third floor.

7. Wilson called the Fire Department and then, using the switchboard, called all the rooms in the Hotel, alerting the residents to the fire.

8. About fifteen minutes later, Harry E. Vonada, the Manager of the Hotel, entered the Lobby, and after being appraised of the fire by Wilson, he and Jennings went to the third floor but were unable to locate the source of the smoke. Vonada then telephoned Wilson from one of the rooms on the third floor and told him that there was no fire at that level. Wilson then went outside, observed that the fire was on the seventh floor, and so advised Vonada.

9. About fifteen minutes before Wilson told Vonada that the fire was on the seventh floor, Altamuro, who operated the newsstand in front of the Hotel, and who was known to Wilson, rushed into the Lobby and shouted to Wilson that smoke was pouring out of one of the rooms.

10. Altamuro then boarded an elevator alone and went to one of the upper floors to alert the residents.

11. Wilson testified that he warned Altamuro not to go because the Fire Department was called and would be soon arriving.

12. Wilson also stated that Altamuro came back down to the Lobby, stayed there for approximately ten minutes and then boarded the elevator a second time. Wilson again warned him "not to go up".

13. Wilson testified that Altamuro went up alone the second time and that this is the last time he saw him alive.

14. At about this time, Officer Edward Markowski of the Philadelphia Police Department noticed the fire while driving in his patrol car. He pulled up in front of the Hotel, went into the Lobby and informed the Clerk at the desk that there was a fire in the Hotel. He then went out to his patrol car and radioed the Fire Department and then returned to the Hotel Lobby.

15. While there, Officer Markowski met Jennings and Altamuro, with whom the Officer was acquainted. The officer said to Jennings: "Let's get upstairs and see what's happening." Altamuro asked if he could also go along to see if "he could give them a hand." Officer Markowski said it was all right with him, "but if anything went wrong, he'd have to get out."

16. All three men then boarded the elevator and went to the seventh floor. They were joined by Vonada, the Manager.[1]

17. All four men went to Room 706 where the fire had started. Officer Markowski tried to open the door but the door was locked. The Officer asked Jennings if he had a key to the room. Jennings said he did. Officer Markowski said: "Open the door." Mr. Vonada ordered Jennings to keep it closed in order to keep the fire contained in the room. Officer Markowski countered by telling Jennings: "I am the law. Open up the door."[2] Jennings complied with his command. When the door was opened, black smoke poured out of the room and into the hallway and filled the entire corridor. The lights in the hallway then went out.

18. The men then became nauseous and the police officer began vomiting. Officer

Markowski ordered the men downstairs, which order the men obeyed.

19. While on the seventh floor, Officer Markowski found a woman unconscious on the floor. He picked the woman up and placed her on his shoulder and carried her down to the fifth floor.

20. When on the fifth floor, Officer Markowski saw Altamuro knocking on doors informing guests of the fire. The police officer asked Altamuro to take the woman down to the Lobby for him. Altamuro carried the woman downstairs and Officer Markowski returned to the seventh floor.

21. When he returned to the seventh floor, Officer Markowski found a tall slender Black male, assisted him to the Lobby, and then across the street away from the Hotel.

22. The officer returned to the Lobby, but at this time, the fire was spreading rapidly. Flaming debris had fallen on the Hotel's marquee and consequently the firemen in the Lobby ordered all policemen and civilians out of the building.

23. Officer Markowski testified that at the time the firemen made this announcement, he observed the presence of Mr. Wilson and Mr. Altamuro in the Lobby and that immediately after this announcement, he escorted these men to the outside of the Hotel.

24. Officer Markowski testified that this was the last time he saw Altamuro alive and never saw him return to the Hotel.

25. The decedent's body was found in Room 710 sometime after he had left the

1. Officer Markowski's testimony that he met Edward Jennings in the Lobby and went upstairs with him, see N.T., 11/24/81, at 95–96, appears to be in direct conflict with Jennings' testimony. Jennings testified that the first time he met Officer Markowski was on the elevator on the third floor of the Hotel where he along with Harry Vonada joined the Officer and then together went to the seventh floor. See Vonada Deposition at 6–7; Jennings deposition at 8. However, because this fact is not of crucial importance to the disposition of this case, I will assume that the Officer's account of his first meeting with Jennings is correct.

2. Officer Markowski later testified that he ordered the door opened because he was told by Mr. Jennings that there was a possibility that the room was occupied. N.T., 11/24/81, at 96. Mr. Vonada expressed his reason for wanting the door to remain closed thus:

Q. Why didn't you want Jennings to open the door?

A. Any stupid bastard knows you don't open up a door when there is a fire in the room.

Vonada Deposition at 24–25. It was subsequently learned that no one was present in Room 706 during the fire.

Hotel to go across the street with Officer Markowski. The cause of death was "inhalation of fumes and carbon monoxide poisoning" and there were burns on his body and "skin slip of the face." [3]

26. The fire at the Milner Hotel had been in progress for an undetermined length of time before the Philadelphia Fire Department arrived.

27. There were four means of access to the seventh floor from the Lobby: two elevators, a stairway and a fire tower.

28. Fire Department personnel had no knowledge of the activities of Officer Markowski and/or the decedent and were unaware of the uses to which the elevators and stairwells were put prior to their arrival at the scene.

29. Fire Department personnel only used the stairway for access to the seventh floor of the Hotel.

30. The decedent's death occurred after the Philadelphia Police Department and Philadelphia Fire Department arrived at the Milner Hotel and ordered all civilians to vacate the premises.

31. The fire that occurred at the Hotel on October 11, 1978 originated in the defective television set owned by the Hotel in Room 706.

32. At the time of his death, Joseph S. Altamuro was forty-three years of age, married and the father of three children:

 Joseph—age 20
 Cheryl—age 14
 Theresa—age 12

His wife and all of the children lived with him and were supported by him, with the exception of his son, Joseph, who worked with him, and was only partially supported by the decedent.

33. The cost of the funeral for Joseph S. Altamuro was $2,001.00.

34. The earned income of the decedent, Joseph S. Altamuro as evidenced by his United States Income Tax Returns was:

1978—$18,984.00
1977—$16,597.00
1976—$15,435.00
1975—$14,074.00
1974—$13,706.00

35. The projected life expectancy of Joseph S. Altamuro was 30.4 years and his work-life expectancy was nineteen years. His past lost earnings, less the cost of his maintenance are $45,572.00; and future lost earnings less cost of his maintenance are $288,800.00 or a total of $334,372.00.

## DISCUSSION

### I. Defendant Milner Hotel

■ Plaintiff's case against the defendant, Milner Hotel, is based principally on the "rescue doctrine", which provides that when one person is exposed to peril of life or limb by the negligence of another, the latter will be liable in damages for injuries received by a third person in a reasonable effort to rescue the one so imperiled. *Guca v. Pittsburgh Railways Co.*, 367 Pa. 579, 80 A.2d 779 (1951); *Toner v. Pennsylvania Railroad Co.*, 263 Pa. 438, 106 A. 797 (1919); *Corbin v. City of Philadelphia*, 195 Pa. 461, 45 A. 1070 (1900); *Truitt v. Hays*, 33 Pa.D. & C.2d 453 (C.P.Ven.1963); W. Prosser, the Law of Torts § 44, at 277 (4th ed. 1971); Annot., 91 A.L.R.3d 1202 (1979).[4]

Perhaps the most quoted articulation of this doctrine was that by then New York Court of Appeals Justice Cardozo:

Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer. The state that leaves an opening in a bridge is liable to the child that falls into the stream, but liable also to the parent who plunges to its aid.... The

---

3. A "skin slip of the face" occurs "when the skin over the face has started to slip away as if it has been . . . blistered and the water was out of the blister." Deposition of Halbert Fillinger, M.D. at 10.

4. The parties agree that Pennsylvania law is to be applied to the substantive issues in the case.

risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of the deliverer. He is accountable as if he had . . . .

*Wagner v. International Railway Co.*, 232 N.Y. 176, 180, 133 N.E. 437, 438 (1921). Twenty-one years earlier, the Pennsylvania Supreme Court stated:

> A rescuer—one who, from the most unselfish motives, prompted by the noblest impulses that can impel man to deeds of heroism, faces deadly peril—ought not to hear from the law words of condemnation of his bravery, because he rushed into danger, to snatch from it the life of a fellow creature imperiled by the negligence of another; but he should rather listen to words of approval, unless regretfully withheld on account of the unmistakable evidence of his rashness and imprudence.
>
> . . . .
>
> . . . . The law has so high a regard for human life, that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons. . . . One who imperils his own life for the sake of rescuing another from imminent danger is not chargeable, as a matter of law, with contributory negligence; and, if the life of the rescued person was endangered by the defendant's negligence, the rescuer may recover for the injuries which he suffered from the defendant in consequence of his intervention.

*Corbin v. City of Philadelphia*, 195 Pa. 461, 468–472, 45 A. 1070, 1072–1074 (1900) (citations omitted). In applying the rescue doctrine, I must first determine the negligence *vel non* of the Milner Hotel.

A. The Negligence of The Hotel Caused a Peril to Its Guests

█ Under Pennsylvania law, a hotel keeper, while not an insurer or guarantor of the safety of his guests, must nonetheless exercise ordinary or reasonable care to keep them from injury. *Lyttle v. Denny*, 222 Pa. 395, 71 A. 841 (1909); *Winkler v. Seven Springs Farm, Inc.*, 240 Pa.Super.Ct. 641,

359 A.2d 440 (1976), *aff'd*, 477 Pa. 445, 384 A.2d 241 (1978); *Hunter v. Hotel Sylvania Co.*, 153 Pa.Super.Ct. 591, 34 A.2d 816 (1943). In *Ritchey v. Cassone*, 296 Pa. 249, 145 A. 822 (1929), the plaintiff's decedent died in a fire at defendant's hotel while he was a guest there. The court spelled out the duty the hotel owed to the decedent as follows:

> [T]here is no presumption of negligence arising merely from the fact that fire breaks out in a hotel. In the present case defendant owned and operated the hotel at the time of the destruction of the building. He was not of course an insurer of the safety of his patrons; but he was bound to exercise such watchfulness and care as would reasonably secure their safety while guests in this hotel. Destruction of a hotel may not be anticipated, but it is generally a possibility. . . . One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences resulting from his carelessness. . . .

*Id.* at 255–56, 145 A. at 824 (citations omitted). *See also* Annot., 60 A.L.R.3d 1217 (1974).

█ Here, the fire at The Milner Hotel on October 11, 1978 originated in the defective television set in Room 706. The defective condition of the television was known to the Hotel through its employee, Jennings, who nevertheless left the set plugged in, unattended and with the power switch in the "on" position. I have no difficulty in concluding that, under these circumstances and given the substantial risk of fire resulting from a short-circuited or otherwise faulty television set, Jennings' conduct clearly amounted to negligence and that his negligence was a substantial factor in placing the lives of the Hotel guests in peril. The very least a reasonably prudent person would have done would have been to disconnect the power source by turning the set off or removing the plug. Of course, Jennings' negligence is imputed to his employer under the doctrine of respondeat superior. *Waggaman v. General Finance Co.*, 116 F.2d 254, 257 (3d Cir. 1940).

That a fire in a ten-story hotel presents an imminent danger to the residents cannot

be gainsaid. The Hotel employees, the police and firemen as well as Altamuro recognized the need for immediate action. The prompt action taken by them at considerable risk to themselves was undoubtedly responsible for preventing a catastrophic loss of life.

## B. Contributory or Comparative Negligence

Having decided that the Hotel's negligence placed the lives of the guests in imminent peril, the next question is whether any conduct on the part of Altamuro would bar recovery.

■ Defendant Hotel argues that since Altamuro's death occurred after the firemen ordered all civilians out of the Hotel and because it can be inferred from the evidence that the deceased heard the command by his conduct in immediately leaving the Hotel, then his final rescue effort was so unreasonable as to preclude recovery by his administratrix. The test, as enunciated in *Corbin v. Philadelphia*, 195 Pa. 461, 45 A. 1070 (1900), is whether the rescuer "acted with due regard for his own safety, or so rashly and imprudently" as to bar recovery. *Id.* at 473, 45 A. at 1074. The court stated that "where another is in great and imminent danger, he who attempts a rescue may be warranted, by surrounding circumstances, in exposing his limbs or life to a very high degree of danger. In such a case, he should not be charged with the consequences of errors of judgments resulting from the excitement and confusion of the moment . . . ." 195 Pa. at 472, 45 A. at 1074. Similarly, in *Simmons v. Pennsylvania Railroad Co.*, 2 Pa.D.&C.2d 233 (C.P. Dauph.1955), the court stated:

"While an attempt to rescue a person from a peril created by another's negligence does not charge the negligent person with liability if it was condemned by reason, and a rescuer who has been injured can be deprived of a recovery from the person responsible for the peril, on the ground that the dangers and desperate character of his act rendered him guilty of contributory negligence, *errors of judgment are to be weighed in view of the excitement and confusion of the moment in determining whether the rescuer acted without rashness or imprudence.*" *Id.* at 238 (emphasis added) (quoting 38 Am.Jur. § 80, at 738).[5] Thus the standard of care for a rescuer is not to act rashly or imprudently.

■ In any event, Pennsylvania has abolished the defense of contributory negligence and has replaced it with comparative negligence. See 42 Pa.Cons.Stat.Ann. § 7102 (Purdon Supp.1981).[6] Although no reported case has applied Pennsylvania's Comparative Negligence Statute to the rescue doctrine, the instant case clearly falls within the literal language of Act, which states that the Act is to be applied to "*all actions* brought to recover damages for negligence resulting in death or injury to person or property . . . ." 42 Pa.Cons.Stat. Ann. § 7102(a) (Purdon Supp.1981) (emphasis added). Courts in other jurisdictions have applied their comparative negligence schemes in similar circumstances, holding that if "the trier of fact finds that the rescue is unreasonable or unreasonably carried out the factfinder should then make a comparison of negligence between the rescuer and the one whose negligence created the situation to which the rescue was a response." *Cords v. Anderson*, 80 Wis.2d 525, 548, 259 N.W.2d 672, 683 (1977). *Accord, Ryder Truck Rental, Inc. v. Korte*, 357 So.2d 228, 230 (Fla.Dist.Ct.App.1978). While I believe Pennsylvania courts would reach a similar result, it is not necessary for me to decide the issue because I find that

---

5. *Cf. Stebner v. YMCA*, 428 Pa. 370, 374, 238 A.2d 19, 21 (1968) ("A building owner responsible for placing an invitee in a dangerous situation cannot escape responsibility for an injury resulting to the invitee, merely because the victim, in fright, frenzy or panic adds to his danger by an act which, in a later serene moment of contemplation, might seem to have been unwise.").

6. *See also Rutter v. Northeastern Beaver County School Dist.*, 496 Pa. 590, 437 A.2d 1198, 1209 (1981) (Except in limited circumstances, not presented in the instant case, the doctrine of assumption of risk is abolished in Pennsylvania).

Altamuro did not act rashly, imprudently or so unreasonably as to constitute negligence on his part under the rescue doctrine.

There is no dispute that during the initial phase of the fire, Altamuro busied himself warning guests at the Hotel of the fire, and later he assisted Officer Markowski in helping people out of the building. The last time Altamuro was seen alive was when he left the Hotel after the firemen ordered all civilians out of the building. There was no evidence as to how Altamuro got back into the building. What prompted his return can only be surmised but, having been successful in two prior missions to the upper floors of the Hotel, I am not convinced that it was unreasonable for him to conclude that he could successfully complete another mission without unduly imperiling his own safety even though he disobeyed the order of the firemen by returning to the building.[7]

II. Third-Party Defendant City of Philadelphia

 The Milner Hotel joined the City of Philadelphia as a third-party defendant alleging that the City took possession and control of the building during the firefighting efforts; that the City was negligent in failing to prevent Altamuro from slipping back into the Hotel after the Fire Department personnel ordered all civilians to leave the building; and that this negligence was the proximate cause of Altamuro's death and therefore the Hotel should be entitled to contribution and/or indemnity from the City. The plaintiff has not asserted any claim directly against the City.

Assuming, without deciding, that the City had a duty to use reasonable care to prevent the plaintiff's decedent from entering the Hotel while it was in flames and thus exposing himself to harm,[8] and assuming further that the Political Subdivision Tort Claims Act, 42 Pa.Cons.Stat.Ann. §§ 8541–8564 (Purdon Supp.1981), would permit an action against the City in these circumstances, nevertheless, I find that the City did not breach this duty, but rather exercised reasonable care under the circumstances. The evidence is clear that once it became apparent to the fire personnel at the scene that the conflagration posed a grave danger, all persons were ordered out and a barricade was erected. There is no evidence that either the firemen or the police became aware that Altamuro had reentered the Hotel. The City is not an insurer or guarantor of a person's safety, see *Chapman v. City of Philadelphia*, 290 Pa.Super.Ct. 281, 434 A.2d 753 (1981), but is liable only for negligent acts which cause him harm. The Hotel's claim against the City must fall simply because it lacks proof. Accordingly, the Hotel is not entitled to recover from the City for contribution and/or indemnity.[9]

---

7. Cf. *Clayton v. Blair*, 254 Iowa 372, 117 N.W.2d 879 (1962) (While plaintiff's decedent was warning others of danger during apartment house fire she was within the doctrine of rescue and, although it did not appear why decedent had returned from second floor of building to third floor, where her apartment was located and her daughter and personal belongings were, jury should have been instructed as to doctrine of rescue.)

8. But see *McGee v. Adams Paper and Twine Co.*, 26 App.Div.2d 186, 271 N.Y.S.2d 698 (1966), aff'd, 20 N.Y.2d 921, 233 N.E.2d 289, 286 N.Y.S.2d 274 (1967); *Chapman v. City of Philadelphia*, 290 Pa.Super.Ct. 281, 434 A.2d 753 (1981).

9. Although not raised at trial or in its third-party complaint, the defendant Hotel in its Proposed Conclusions of Law asserts that "the City of Philadelphia, by its employee, Edward Markowski, was negligent in ordering hotel personnel to open the door to Room 706." Assuming that this defense has been properly raised, I find it to be without merit.

I first note that under Pennsylvania law, once Officer Markowski learned of the possibility that a person's life was in danger, he had a duty to make a reasonable effort to save that person. See *DeGregorio v. Malloy*, 356 Pa. 511, 52 A.2d 195 (1947); *Valente v. Lindner*, 340 Pa. 508, 17 A.2d 371 (1941). Furthermore, since Officer Markowski was acting in an emergency situation, he was not required to exercise the *best* judgment, but only had to behave "as a reasonably prudent man would have acted under the same or similar circumstances." *DeGregorio v. Malloy*, 356 Pa. 511, 514–15, 52 A.2d 195, 197 (1947).

The evidence at trial reveals that Mr. Jennings told Officer Markowski that there was a possibility that someone was in Room 706, the place where the fire had started. See footnote 2 *supra*. Faced with this situation, I find that

III. Damages

The plaintiff, as the Administratrix of the estate of Joseph S. Altamuro, brought a survival action to recover damages to the decedent's estate, 42 Pa.Cons. Stat.Ann. § 8302 (Purdon Supp.1981) and a wrongful death action on behalf of herself and her children. 42 Pa.Cons.Stat.Ann. § 8301 (Purdon Supp.1981). She is permitted to claim under both Acts, but the damages must not overlap. *Ferne v. Chadderton*, 363 Pa. 191, 69 A.2d 104 (1949); *McClinton v. White*, 285 Pa.Super.Ct. 271, 427 A.2d 218 (1981). Recovery on the survival claim, which accrues to the estate, consists of compensation for pain and suffering, and damages for the loss of earning power of a decedent for his life expectancy less the cost of his maintenance. *McClinton v. White, supra; Krakar v. Don Swart Trucking, Inc.*, 323 F.Supp. 157 (W.D.Pa. 1971). "Recovery under the Wrongful Death Act, which runs in favor of the statutory beneficiaries, consists of funeral and medical expenses plus compensation for pecuniary loss suffered by reason of the decedent's death." *Soares v. McClosky*, 466 F.Supp. 703, 708 (E.D.Pa.1979).

Plaintiff's evidence on damages was as follows. She introduced the funeral bill, which amounted to $2,001.00, and the decedent's tax returns for the years 1974 through 1978. Plaintiff also introduced the testimony of an actuarial-economic consultant, who testified that Joseph S. Altamuro at the date of his death had a life expectancy of 30.5 additional years and that he had a work life expectancy of nineteen years. He further stated that his computations revealed that Altamuro's past lost earnings were in the amount of $45,572 after deducting his personal maintenance expenses, which the expert calculated at 24% of his earnings, and that his future lost earning capacity would be $288,800 after deducting the same amount of personal maintenance expenses. Thus, the total lost earning capacity of Altamuro, both past and future, after deducting his personal maintenance expenses, is $334,372.00.

In accordance with this evidence, I find that Altamuro's loss of expected lifetime earnings, minus his personal maintenance expenses amounts to $334,372. Furthermore, based on the medical examiner's testimony relating to the suffocation of decedent and the presence of burn blisters on Altamuro's face, I find that the plaintiff is entitled to recover damages for the decedent's pain and suffering prior to his death, even though it was for a short period of time. *See Weiner v. White Motor Co.*, 223 Pa.Super.Ct. 212, 297 A.2d 924 (1972). The sum of $10,000 is reasonable compensation for this item of damages. Thus the total amount of damages awardable under the survival action is $344,372, but because the loss of earnings less personal maintenance expenses will duplicate an award in the wrongful death action, these damages will be eliminated from the survival action. *See Ferne v. Chadderton*, 363 Pa. 191, 69 A.2d 104 (1949); *McClinton v. White*, 285 Pa.Super.Ct. 271, 427 A.2d 218 (1981).

In *McClinton v. White*, 285 Pa.Super.Ct. 271, 427 A.2d 218 (1981), the Superior Court recently held that under the Wrongful Death Act the following damages are recoverable:

"[T]he deceased's probable earnings during the probable duration of the deceased's life, which could have gone for the benefit of the children, parent, husband or wife as the case may be; the value of such services as the deceased would have rendered to the named beneficiaries, and such gifts as the deceased would have been reasonably expected to have given the beneficiaries. The

---

the police officer acted reasonably when he opened the door in an attempt to save that person even though there was a chance that the fire would spread to other parts of the Hotel when the door was opened. It is undisputed that no other way existed for the police officer to determine whether someone was perilously trapped in the room. The fact that later it was learned that there was no one in Room 706 during the fire has no bearing on the question of whether Officer Markowski acted reasonably in the existing emergency with which he was confronted. Accordingly, I find that the Police Officer was not negligent and therefore his employer, the City of Philadelphia, is not liable to the Hotel on the third-party complaint.

Wrongful Death Act itself also specifically provides for the recovery of medical expenses and funeral expenses. The cost of the tombstone and the cost of administration of the estate have also been held to be proper items of damage."

*Id.* at 278 n. 5, 427 A.2d at 221 n.5 (quoting 2 Feldman, Pennsylvania Trial Guide § 33.-14). The "value of such services as the deceased would have rendered to the named beneficiaries", includes the society and comfort the deceased would have given to his family had he lived, work around the house and the guidance, tutelage and moral upbringing he would have given his children. See *Thomas v. Conemaugh Black Lick Railroad*, 133 F.Supp. 533 (W.D.Pa.1955), *aff'd*, 234 F.2d 429 (3d Cir. 1956); *Spangler v. Helm's New York-Pittsburgh Motor Express*, 396 Pa. 482, 153 A.2d 490 (1959); *Gaydos v. Domabyl*, 301 Pa. 523, 152 A. 549 (1930).

There is no evidence in the record, however, to show what portion of his earnings Altamuro regularly contributed to his family; nor is there any testimony with respect to the customary services Altamuro rendered to his family. However, given today's economic conditions, a father of four with an annual income of $19,219 [10] would spend his entire earnings, minus his personal maintenance expenses, on his family. Moreover, I find that, as a result of her husband's death, Mrs. Altamuro and her children will suffer intangible or non-monetary losses such as the loss of society, comfort and the normal services and guidance a husband father provides to his wife and children.

I therefore conclude that the plaintiff sustained the following damages under the Wrongful Death Act: (1) Funeral Expenses: $2,001; (2) Loss of deceased's earnings which would have gone to the benefit of his wife and children: $334,372; and (3) Value of non-monetary or intangible services which the deceased would have provided to his wife and children: $50,000.

Accordingly, the total damage award to the plaintiff under both Acts is as follows:

| | |
|---|---|
| Under the Survival Act Pain and Suffering | $ 10,000 |
| Under the Wrongful Death Act Funeral Expenses | 2,001 |
| Loss of Deceased's Earnings Which Would Have Gone to Wife and Children | 334,372 |
| Value of Non-Monetary or Intangible Services Which Deceased Would Have Provided To Wife or Children | 50,000 |
| TOTAL— | $396,373 |

Accordingly, I arrive at the following

## CONCLUSIONS OF LAW

1.The Court has jurisdiction over the subject matter and the parties.

2.The defendant, The Milner Hotel, Inc., by the acts of its employees, was negligent, and this negligence placed the lives of the residents in imminent peril. Such negligence was the cause of the death of Joseph S. Altamuro.

3.The plaintiff's deceased, Joseph S. Altamuro, did not act rashly, imprudently or unreasonably in his efforts to alert the residents of The Milner Hotel to the imminent danger of the fire and in aiding in their removal from the building.

4.The City of Philadelphia was not negligent and therefore is not liable to the defendant-third party plaintiff.

5.Plaintiff is entitled to judgment in her favor and against defendant The Milner Hotel, Inc. in the amount of $396,373.

6.The third-party defendant City of Philadelphia is entitled to judgment in its favor and against third-party plaintiff The Milner Hotel, Inc.

10. See Plaintiff's Exhibit 17E, Decedent's 1978 Federal Tax Return.